60709/00053888

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID GILMORE, a shareholder of Covington Fabrics Corp. a/k/a Covington Industries, Inc., and its successor, Cele Holdings, Inc., two New York corporations, and a limited member of CIRS, LLC, a limited liability company organized under the laws of South Carolina, and a limited member of Gilmore Holdings, LLC, a New York limited liability company, suing individually and in the right of Cele Holdings, Inc., CIRS, LLC, and Gilmore Holdings, LLC,

      Plaintiff,    Case No.: 09 Civ. 6230 (WHP) (HBP)

  -against-       ECF Case

ABBY GILMORE, ARTHUR FREIERMAN, and
SOUTHBRIDGE FINANCIAL CORP.,

      Defendants,

  -and-

CELE HOLDINGS, INC., and CIRS, LLC,

      Nominal Defendants.
------------------------------------------------------------X

## DECLARATION OF DAVID GILMORE

STATE OF NEW YORK   )
          ) ss.:
COUNTY OF NEW YORK  )

  David Gilmore hereby declares, upon penalty of perjury pursuant to 18 U.S.C. § 1746, that the following is true and correct:

  1.  I am a twenty-five percent (25%) shareholder/member in three companies collectively known as the "Gilmore Companies": Covington Fabrics Corp., also known as Covington Industries Inc., a New York corporation, and its successor, Cele

Holdings, Inc. ("Covington" or "Cele"); CIRS, LLC ("CIRS"), a South Carolina limited liability company; and Gilmore Holdings, LLC, a New York limited liability company. I am the Plaintiff in the above-captioned action against my sister Abby Gilmore ("Abby"), her husband Arthur Freierman ("Arthur"), and Arthur's company, Southbridge Financial Corp. ("Southbridge") (collectively, "Defendants"), and I have brought this lawsuit both individually and on behalf of Cele and CIRS. I also have been appointed Receiver for Cele and Gilmore Holdings pursuant to a Consent Order entered by this Court on August 10, 2009.

    2.  I submit this Declaration in support of a motion seeking leave to file a Second Amended Complaint in a form substantively identical to the Proposed Second Amended Complaint ("PSAC"), a redlined copy of which is annexed hereto as Exhibit "1". As set forth below, the motion to amend should be granted because I only discovered the facts underlying the new allegations in April of 2010, after the commencement of this litigation, and because Defendants willfully concealed evidence and prevented me from discovering those facts sooner.

### I.   Introduction

    3.  My father, Benjamin Gilmore, founded Covington, a textile converting company in the 1940s. Under his leadership, Covington grew into a national company with gross profits well over $100,000,000 per year.

    4.  In the 1970s, my father brought each of his four children into the business by giving each of them equal, non-voting shares in Covington. The four Gilmore siblings, from eldest to youngest, are Michael Gilmore ("Michael"), myself, Abby, and Karen Gilmore ("Karen").

5. In the early 1980s, Abby, an attorney admitted to the practice of law in the State of New York, became employed full time by Covington, with my father's hope and understanding that she would take over leadership of the business upon his death. I, too, joined Covington, as Secretary, and Michael joined as Treasurer, though we each worked part time to accommodate our positions as professors of anthropology and American literature, respectively. .

6. In 1992, my father died, leaving the voting and non-voting stock to the Gilmore siblings in equal share. In that year, the Internal Revenue Service valued Covington at $40,000,000. The Gilmore siblings voted to appoint ourselves as members of the Board of Directors for Covington (the "Board"), and during the following three (3) years, Abby took over control of many of Covington's day-to-day decisions. Also, at some point during this period or shortly before, Arthur, Abby's husband, also an attorney admitted to the practice of law in the State of New York, began to provide legal, financial, and management consulting services to Covington and the Board. Given their training as attorneys, as well as their experience in corporate and business matters, unlike any of the other Gilmore siblings (Karen is a psychoanalyst), my other siblings and I trusted Abby and Arthur to advise and lead the company honestly and faithfully. Most of all, we trusted them because Abby was and is our sister, and Arthur, our brother-in-law.

7. Abby insisted on being compensated substantially for her full-time commitment to Covington, and she also wanted a written contract limiting the circumstances under which her employment could be terminated. The Board agreed, and by a Shareholders' Agreement and Employment Agreement dated January 1, 1995 (Exs. "1" and "2" to the Proposed Second Amended Complaint, respectively), Covington hired

3

Abby to be President and Chief Executive Officer. Her base salary was $350,000 per year, plus a bonus of $350,000 per year, both to be adjusted for cost-of-living increases, as well as fringe benefits, for a term of seventeen (17) years, and a severance package of five (5) years' salary. *See* Employment Agreement (PSAC Ex. "2"), at ¶¶ 2, 4(a), 4(b), 4(c), 5, 7. In addition, the Employment Agreement could only be terminated "for cause", although one "cause" was perpetration of fraud upon the employers or its shareholders, or misappropriation of corporate funds. *Id.* at ¶ 7(c)(iv).

8.  The Board likewise did not object to retaining Arthur and his company Southbridge as a Vice President of Covington and legal, management, and financial consultant, in light of his education and work experience, which included approximately five (5) years of employment as a corporate attorney at the national law firm of Debevoise & Plimpton LLP. In his capacity as legal advisor, Arthur gave the Board and shareholders legal advice about matters concerning Covington, including whether certain transactions were advisable, and whether the Board members or shareholders faced personal liability for any particular actions Covington might take (or not take). When Arthur spoke about Covington's legal and business affairs, I trusted that he was being honest and faithful, especially since he was part of the family, but also because he was an experienced corporate attorney who appeared knowledgeable and able.

9.  In 1998, the Gilmore siblings organized a South Carolina limited liability company, CIRS, to own a warehouse located at 4544 Blackstock Road, Spartanburg, South Carolina (the "Warehouse").

10. Starting in 1999, Covington collapsed, losing $26,000,000 over the next seven (7) years. The Board consented to the sale of Covington's assets to a

company named Covington Holdings, Inc. ("New Covington"), a sale that closed on February 6, 2006, for a small fraction of Covington's value in the 1990s. "Old Covington" changed its named to Cele Holdings, Inc. shortly thereafter. None of the Gilmores owned New Covington, which went out of business two (2) years later.

## II. The Complaint And Prior Proceedings

11. Despite their generous compensation and benefits from Covington, Abby and Arthur decided to use their position of authority and dominance to take more, even if doing so would be detrimental to the rest of the Gilmore family. As stated in detail in the First Amended Complaint [Docket No. 24],[1] they embarked on one improper and fraudulent scheme after another, including the following, starting in or around 2004: (1) frightening the shareholders into believing that they faced personal liability for a shortfall in Covington's pension plan, even though no such personal liability existed, and ultimately inducing Karen to forfeit her interests in the Gilmore Companies for a pittance (as well as inducing Michael and myself to relinquish our contractual right of first refusal to purchase such her interest at a bargain price); (2) causing Arthur and his company Southbridge to be paid grossly inflated fees in connection with his consultancy; (3) inducing Michael to sell his interest in CIRS out of fear that he would be personally liable on an intra-company note between CIRS and Covington, even though no such personal liability existed; (4) inducing me, through fraudulent representations of a "paper transaction" in which I would "come out ahead a few weeks later", to pay over $124,000 and relinquish $333,333 in debentures owed to me by Covington, as part of a complicated series of transactions in connection with Michael's relinquishment of his CIRS interest;

---

[1] The Complaint was filed on July 16, 2009. It was amended in December 2009, upon consent of the parties, to add Covidton and CIRS as nominal defendants.

5

(5) holding a "Special Meeting of the Board" attended only by Abby and Arthur, deciding that Abby was entitled to over $1,000,000 in severance pay, even though she had previously waived such severance, and then demanding that Michael and I pay our "prorated share"; and, (6) otherwise finding ways to siphon off large sums of money and other assets of the Gilmore Companies.

12. In July 2009, I directed my attorneys to commence this action to seek legal redress for the above-mentioned injuries, an accounting to obtain documents evidencing *all* compensation paid to Abby and Arthur which had been withheld from shareholders despite prior repeated verbal and written demands, and, to protect the Warehouse, the Gilmore Companies' last remaining asset, which was scheduled to be sold imminently.[2] In light of Arthur's threat to me that he would bill CIRS until nothing remained from the sales proceeds to be distributed to me, I asked my attorneys not only to seek money damages, but also, to have this Court order the Defendants not to distribute any more funds to any of the Defendants without permission of the Court, and to appoint me as Receiver of the Gilmore Companies so that I could obtain all of the corporate documents that had been withheld and perform an accounting of both CIRS and Cele, and in order to preserve whatever assets remained of the companies.

13. Pursuant to an Order, on consent, entered on August 10, 2009 (the "August 10th Order" [Docket No. 16]), the Court ordered that: (1) Defendants be restrained from transferring any funds from CIRS to any defendant without leave of the Court; (2) appointed me as Receiver to Cele and Gilmore Holdings, LLC; and, (3)

---

[2] On August 13, 2009, the Warehouse was sold for $2,792,500.00. The net proceeds of the sale, totaling $1,659,719.56, have been placed in an interest-bearing escrow account maintained by Defendants' counsel pending resolution of this litigation.

directed Defendants to transfer all documents and records of Cele and Gilmore Holdings to me.

14.     Following the August 10th Order, Defendants, by their former counsel, Attorney Robert Meister, in correspondence to Plaintiff and the Court concerning the transfer of Covington documents, attempted to effectuate the destruction of all pre-2002 Covington documents under the guise of "economy" and "convenience." I refused to consent to Defendants' proposed destruction of documents.

15.     Among the documents I obtained on August 13, 2009, pursuant to the August 10th Order, were 712 boxes of documents that had been stored at the South Carolina Warehouse prior to its sale; those boxes have since been stored, at my own personal expense, at a storage facility in Hauppuage, New York. Thirteen (13) additional boxes were produced to my counsel[3] in connection with the August 10th Order.

16.     The parties then engaged in substantial documentary discovery. My attorneys demanded Defendants' documents, including electronically-stored information ("ESI"), on November 12, 2009. Defendants failed to produce their ESI until March 17, 2010, at which time their new attorneys delivered over 98,000 pages of documents to my attorneys, who then reviewed those documents ahead of depositions, which began April 27, 2010. Thus far, Michael and Karen, as well as Sharon Emek (my wife) have been deposed. None of the parties' depositions have been taken yet.

*[Remainder of Page Intentionally Left Blank]*

---

[3] By a So-Ordered Stipulation dated January 8, 2010 [Docket No. 26], Itkowitz & Harwood is authorized to represent me as Receiver to the extent of receiving and transmitting communications for me in my capacity as Receiver.

### III. Newly-Discovered Evidence Concerning Finder's Fees In Connection with Covington's Corporate Acquisitions in the 1990s

17. My attorneys' review of Defendants' documents, and Defendants' ESI in particular, uncovered evidence that Defendants, beginning in 1994 and continuing through 1999, paid themselves undisclosed finder's fees in connection with six corporate acquisitions. *See* PSAC ¶¶ 39-76 & Exs. "4", "5A", 5B", "5C", and "5D" to the PSAC.

18. During the 1990s, Covington acquired some or all of the assets of six companies: (i) Chelsea of London Limited ("Chelsea"), by an Asset Purchase Agreement dated April 1, 1994 (the "Chelsea APA"), for an amount presently unknown to Plaintiff; (ii) Spectrum Fabrics, L.P. ("Spectrum"), by an Asset Purchase Agreement dated July 8, 1994 (the "Spectrum APA"), for $3,500,000; (iii) Tasco Industries, Inc. ("Tasco"), by an Asset Purchase Agreement dated January 4, 1995 (the "Tasco APA"), for $1,250,000 plus certain assumed liabilities; (iv) Fame Fabrics, Inc. and Spektor Export Corporation ("Fame"), by an Asset Purchase Agreement dated December 20, 2006 (the "Fame APA"), for $6,827,604 plus certain assumed liabilities; (v) P. Kaufmann, Inc. ("Kaufmann"), by an Asset Purchase Agreement dated May 7, 1998 (the "Kaufmann APA"), for $625,000 plus certain assumed liabilities; and (vi) Rapier/Cambridge Mills, Inc. ("Rapier"), by an Asset Purchase Agreement dated January 6, 1999 (the "Rapier APA"), for $1,751,203 plus certain assumed liabilities. Covington also resold its interests in Chelsea by a Share Purchase Agreement dated April 30, 1998 (the "Chelsea SPA"), for £75,000 ($125,452.50 in 1998 dollars).

19. Abby and Arthur *never* disclosed to either myself or my siblings, either as shareholders or as directors, including at Board meetings, that finder's fees were going to be paid to Arthur and his company, Southbridge. Instead, Abby and Arthur

presented us only with the material terms of the acquisitions, such as price and company background, strongly advised us that Covington should make the acquisition, and told us to "sign here," never disclosing that finder's fees would be paid to Arthur and/or his company, Southbridge, if the transactions were consummated.  As far as we could tell, Abby and Arthur were stating the material terms of the acquisitions correctly and completely.  We all thought that Abby and Arthur were advising us as to what they believed would be in Covington's best interest, and of course we expected them to do so, mostly because they were and are our family, but also because they managed the company's day-to-day workings and had more knowledge about Covington's business affairs.  In addition, Abby was a co-equal shareholder, so we believed she had as much at stake as we did and therefore would have as much to lose as we would if the acquisitions failed.  We also believed that, as legal and business consultant to Covington, Arthur was recommending these acquisitions because he truly thought and believed, based upon his experience, research, and knowledge, and not out of any self-interest, that such acquisitions would be profitable and beneficial to Covington.  For these reasons, the Board approved each of the acquisitions unanimously, except that Michael abstained in connection with one of the acquisitions.

20. Had we known that Arthur and his company, Southbridge, were going to be paid finder's fees in the event the acquisitions were consummated, and thus, had a tremendous self-interest in recommending approval apart from his role as legal and business adviser, we would never have voted to approve the transactions.  Both Karen and Michael, who were fully questioned in their depositions about the finder's fees, both

expressed "shock" and/or surprise that they were not notified of the payment of finder's fees.

21. Further, I do not recall signing *any* checks for finder's fees, as baselessly maintained by the Defendants in this litigation, and the Defendants have failed to produce copies of any checks signed by me for finder's fees.

22. As it turns out, all of the acquisitions ultimately did fail, and my recollection and belief is that the Chelsea resale was for a very steep loss.

23. Years later, following the sale of Covington, Michael and I confronted Arthur over what we believed were excessive management fees being charged purportedly to wind up Cele.[4]  We had also become concerned that Arthur had failed to accomplish several basic management matters, including that he had not arranged for us to receive K-1 tax returns from Covington for tax year 2006.

24. In response, on August 23, 2007, Arthur sent a detailed memorandum by email to us to defend his fees and his rates, including six attachments. One of the six attachments was a memorandum marked "confidential" dated December 28, 1994 (copy annexed to the PSAC, Ex. "1" hereto, as Exhibit "4"), from Arthur to Abby, without a copy ever being sent to my siblings or me -- even though we were not only shareholders, but directors of Covington.

25. The Defendants also baselessly contend that I had notice of finder's fees being paid to Arthur and/or Southbridge as of August 23, 2007, the date of Arthur's email defending his *management* fees and attaching the 1994 confidential memorandum.   I clearly could not have understood from the "confidential

---

[4] Karen sold her interests in the Gilmore Companies to Arthur on August 31, 2005. Thereafter, she had no further involvement with the family business.

10

memorandum" whether Southbridge had been paid any of the fees that Arthur proposed in that document. To the contrary, the memorandum indicates that the proposed acquisition of the unnamed company in question was not going forward.[5] No prior "finder's fees" are discussed in the memorandum. Accordingly, I was not put on notice by the confidential memorandum that any finder's fees had been paid to the Defendants.

26. Moreover, after Arthur's unconvincing defense of his excessive fees, I thereafter made repeated demands that Defendants produce copies of all documents evidencing *all* compensation paid to Defendants by the Gilmore Companies, including by: (i) a letter from Iven Taub, Esq., an attorney retained by Michael and myself, dated October 11, 2007 (copy annexed hereto as Exhibit "2"); and (ii) a letter from Larry Hutcher, Esq., a second attorney I retained, dated December 19, 2007 (copy annexed hereto as Exhibit "3"). I also thereafter made numerous verbal demands for documentation, including until shortly before this lawsuit was filed.

27. As a director and shareholder of Covington, I had an absolute right to such information.

28. Nevertheless, the Defendants absolutely refused to produce any documents and "stonewalled" my every request for documentation.

### IV. Documents Showing That Southbridge Took Undisclosed Finder's Fees

29. It was only *after* the commencement of this litigation, and upon the receipt of certain documents in discovery, that I discovered that finder's fees had been surreptitiously paid to Defendant Freierman and his company, Southbridge.

---

[5] Specifically, the memorandum discusses a flat finder's fee of $150,000.00 if the transaction were to close, ". . . *although that does not now appear to be the case*." PSAC (Ex. "1" hereto) Ex. "4", at 1-2 (emphasis added).

30.     Among the 98,000 pages of ESI produced by Defendants in this litigation were three documents evidencing the payment of undisclosed finder's fees in connection with the 1990s acquisitions.

31.     First, in connection with the Spectrum transaction, Abby and Arthur produced an invoice dated August 1, 1994 (copy annexed to the PSAC, Ex. "1" hereto, as Ex. "5A"), which was embedded in Defendants' computer hard drive, by which Arthur recited the "Lehman" fee scale, stated that the amount due pursuant to the fee scale was $130,000, applied a "50% one-time discount for identification of target" in the amount of $65,000 as well as a "15% 'preferred client' discount" in the amount of $19,500, and stated that an amount was due and owing of $45,500.  *See* PSAC, Ex. "1" hereto, at ¶ 46 & Ex. "5A".

32.      Second, in connection with the Tasco transaction, the Defendants produced an invoice dated January 31, 1995 (copy annexed to the PSAC, Ex. "1" hereto, as Ex. "5B"), which was also embedded in Defendants' computer hard drive, by which Arthur again recited the "Lehman" fee scale, claimed that the purchase price (including assumption of debt) was $1,433,000, not the $1,250,000 paid by Covington, stated that the amount due pursuant to the fee scale was $67,320, applied a credit "against excess over $50,000 (for retainer paid pursuant to 12/15/94 memorandum regarding fees)" in the amount of $17,320, and stated that an amount was due and owing of $50,000.  *See* PSAC, Ex. "1" hereto, at ¶ 52 & Ex. "5B".

33.     Third, in connection with the Chelsea SPA (resale), Defendants produced an invoice dated May 28, 1998, (copy annexed to the PSAC, Ex. "1" hereto, as Ex. "5C"), also embedded in Defendants' computer hard drive,  by which Arthur stated

that "[a]s you know, Southbridge Financial Corp. agreed to pay fees in the amount of £5,000 each to Sanjay Ahya and Michael Hughes for their efforts in connection with the sale of Chelsea of London…." Arthur then requested that Abby "arrange for the amount of $16,814.00 [i.e., the equivalent amount in 1998 U.S. dollars] to be transferred to Southbridge…." *See* PSAC, Ex. "1" hereto, at ¶ 62 & Ex. "5C".

34. Only after seeing these documents, which I received for the first time on March 17, 2010, when Abby and Arthur belatedly produced their ESI in this litigation, did my attorneys and I have evidence that finder's fees had been surreptitiously paid to Defendant Freierman and his company, Southbridge.

35. Notably, hard copies of the three invoices were never produced, suggesting that the only copies of such invoices were embedded on Abby's and Arthur's computer hard drives.

36. Not only were copies of the invoices lost or destroyed, ***copies of the checks in payment of the finder's fees were also destroyed by the Defendants***, as indicated in an email dated October 3, 2005 (copy annexed hereto as Exhibit "4").

37. We thereafter consulted the closing books for each of the three aforementioned transactions, which books were contained in the 13 boxes transferred to my attorneys and discovered that in each case, the agreements had expressly provided that "no finder's fees" would be paid. *See* PSAC, Ex. "1" hereto, at ¶¶ 44, 49, 61.

38. Finally, we recovered from the 712 boxes of documents – which I received only after my appointment as Receiver – further evidence of the finder's fees scheme: a single hard-copy invoice in the amount of $102,491.93, dated January 10, 1999, for the Rapier transaction (copy annexed to the PSAC, Ex. "1" hereto, as Ex.

"5D"), and a general ledger and check journal for the isolated period of June 1, 1994 to February 28, 1995, containing entries showing that payment was made to Southbridge on August 5, 1994, in the amount of $45,500, and to Southbridge on February 15, 1995, in the amount of $50,000.  Although there is no indication in the ledger/journal that the payments are for finder's fees, the dates and amounts correspond with the Spectrum and Tasco invoices which were produced in Defendants' ESI from their computer hard drives.  It is the cross-referencing of the documents that establishes the payment of finder's fees to the Defendants.  The ledger/journal and the Rapier invoice, both located in the 712 boxes, not only are the very documents *previously withheld by Defendants*, they also *were designated for destruction by Defendants' prior counsel at the outset of this litigation.*

### V.     Knowledge of Surreptitious Finder's Fee Payments

39.     As a result of Defendant's above-described withholding of documents and destruction of evidence, I did not have knowledge of facts from which I could infer that I had been defrauded by the Defendants' surreptitious payment of finders fees until I received the invoices from Defendants' ESI embedded in their computer hard drives (attached to the Proposed Second Amended Complaint as Exhibits "5A", "5B", and "5C".  Those documents, and only those documents, gave me sufficient knowledge to make further investigation by inspecting the closing statements, contained in the 712 boxes which were produced only after my appointment as receiver, where I also found the general ledger and the single hard-copy invoice for the Rapier acquisition transaction.  It was only upon reviewing *those* documents that I concluded, in consultation with my attorneys, that I had in fact been defrauded into consenting to those corporate acquisitions

14

without disclosure of the Defendants' self-interest in consummating the transactions which resulted in hundreds of thousands of dollars in finder's fees being paid to Southbridge.

40. My siblings, like me, had no clue that Southbridge had taken hundreds of thousands of dollars in finder's fees. Had either Michael, Karen or myself been advised that Arthur was earning a "finder's fee" on each of these transactions, I do not believe these transactions would ever have been approved. This information would have alerted us that Arthur (and Abby) were profiting at the family's expense regardless of how the transactions ultimately turned out. As it were, these transactions cost the company millions of dollars and were significant factors in driving the company into the ground.

41. None of this would have happened, I believe, if Abby and Arthur's self-dealing had been timely disclosed to the Board.

## VI. Conclusion

42. Accordingly, for the reasons stated, I ask that the Court grant this motion to file a Second Amended Complaint in a form substantively identical to the Proposed Second Amended Complaint annexed hereto as Exhibit "1".

_____
DAVID GILMORE

Sworn to before me this
7th day of July, 2010

_____
NOTARY PUBLIC

Simon W Reiff
Notary Public State of New York
No. 02RE6186704
Qualified in Kings County
Commission Exp 05/05/2012