UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
DAVID GILMORE, a shareholder of Covington :
Fabrics Corp. a/k/a Covington Industries, Inc., and its :
successor, Cele Holdings, Inc., two New York :
corporations, and a limited member of CIRS, LLC, a : Case No. 09-CV-6230-WHP
limited liability company organized under the laws of :
South Carolina, and a limited member of Gilmore :
Holdings, LLC, a New York limited liability :
company, suing individually and in the right of Cele :
Holdings, Inc. CIRS, LLC, and Gilmore Holdings, :
LLC, :
:
         Plaintiff, :
:
 - against - :
:
ABBY GILMORE, ARTHUR FREIERMAN and :
SOUTHBRIDGE FINANCIAL CORP., :
:
         Defendants. :
---------------------------------------------------------------- X

## AFFIDAVIT OF ROGER GILMARTIN

STATE OF CONNECTICUT )
          ) ss.
COUNTY OF FAIRFIELD  )

  Roger Gilmartin, being duly sworn, hereby deposes and says:

  1. I am not a party to this action and have no interest in the outcome of the matter. I am over the age of eighteen (18) and am fully competent to make this affidavit, which is based on personal knowledge.

  2. In April 1996, I joined Covington Industries Inc. (the "Company") as Executive Vice President and President of the Covington Fabrics Division (the main part of the

Company). Prior to joining Covington, I served as Chairman and CEO of the Opp & Micolas Division of Johnston Industries and, for 18 years prior to that, I was Senior Vice President and Director at Werner International Management Consultants, the world's leading consultancy practice serving the fiber, textile and apparel industries. In the 1960s and 1970s, I also held a variety of management posts in the UK textile industry. During my 40 years in the textile industry, I have been involved in numerous mergers and acquisitions transactions. The Gilmore family hired me in 1996, to help them face the challenges of the industry which was suffering a decline due, in part, to consolidations and off-shore manufacturing.

3. I worked for the Gilmore family at the Company for 10 years until it was sold in 2006. As the second-highest ranking executive in the Company, I was familiar with all aspects of the business and all members of the Gilmore family. I attended all Board meetings, received all financial information and had authority to commit the Company to significant contracts and obligations.

4. Although I had check signing authority for the Company (together with the CFO), David Gilmore ("Denny"), who was an officer and director of the Company, had primary responsibility for signing Company checks. From the time I began working at the Company I saw Denny almost every week when he came in to sign checks. The entire accounts payable and check preparation process at the Company was designed to accommodate Denny's weekly schedule. Invoices from vendors were first approved and submitted to the Accounts Payable department by the relevant executive or department head. The item was then assigned an account number by the Controller's department and passed to the CFO for approval. Accounts Payable then entered the check into the check run and it was printed and attached to all

the backup information. The stacks of checks with backup information behind each check were then placed in wooden "out" boxes and were brought to Denny in an office or the conference room where he reviewed and signed the checks. These checks included payments to Southbridge Financial Corp. ("Southbridge"). When Denny had questions regarding any particular item, he would ask me, the Controller, the CFO, the department head or Abby Gilmore ("Abby") to clarify the item. When Denny was not available (e.g., on vacation) or if a check was needed on an expedited basis, either Abby, or, in her absence, I and the CFO, would sign the check. However, it was very rare that Denny did not come in weekly to sign checks. As a result, during my 10 year tenure at the Company, Denny signed the vast majority of Covington checks.

     5. One of my roles at the Company was the management of the warehouse and distribution center in South Carolina (first in McColl, SC and after 1998 in Spartanburg, SC). The Warehouse Manager throughout my tenure was Desiree Huff, who reported to me and with whom I had contact on a nearly daily basis. Periodically, the CFO of the Company and I arranged for documents to be sent for storage to the warehouse. These documents were stored or disposed of at the direction of the Company's CFO. Neither Abby nor Arthur Freierman ("Arthur") was ever directly involved. I closely managed the number of staff at the warehouse and heard regularly from Ms. Huff regarding the staff she needed and the tasks she faced. I never heard of any request for the retrieval of any documents from the stored boxes on behalf of Abby or Arthur.

     6. I have reviewed the October 3, 2005 e-mail memorandum regarding "File Reorganization" that I understand is attached as Exhibit 4 to the Declaration of David Gilmore. This email was a routine housekeeping memorandum sent to department heads regarding

3

cleaning and reorganizing files in preparation for the Company's move to new, much smaller offices. Interoffice memoranda about filing and administrative matters were never sent to Board Members.

7. During my tenure at the Company, I, along with the CFO, attended the quarterly meetings of the Board of Directors. As far as I recall, all four Gilmore siblings attended each meeting as did Arthur Freierman and Karen Gilmore's husband, Mitchell Charap. Abby structured the meetings so that the Directors had as much opportunity as possible to understand the issues facing the Company and to inquire about financial and management matters. Denny attended these meetings, and as Secretary took the minutes. Arthur reported to the Board on the activities of Southbridge, who acted as investment banker and financial advisor to the Company, at practically every meeting. Arthur worked closely with me and other staff during the 1990s in the acquisition of other textile companies, the acquisition of a new warehouse facility, and the implementation of a new software system. The CFO would report on the financial status of the Company at each meeting. Further, the Company's outside auditors would present their findings to the Board at these meetings on an annual basis, when the financial statements were distributed to the Board members and myself.

8. To retain its competitive advantage in the textile industry, the Company explored many potential acquisition targets. Many companies were considered and rejected. However, the Company did acquire the assets of Rapier/Cambridge Mills, Inc., Chelsea of London Limited, Tasco Industries, Inc., Spectrum Fabrics, L.P. and Fame Fabrics, Inc./Spektor Export Corporation, and certain assets of P. Kaufmann, Inc. in the 1990s. Many of the acquisitions ended up yielding significant profits for the Company in the ensuing years. When

each of these acquisitions was being considered, it was discussed at length at Board Meetings, which discussions included what the Company hoped to achieve through each acquisition. Further, the transaction documents for each acquisition were always available on Company premises for inspection by directors and officers.

9. In connection with these acquisitions, the Company engaged Southbridge as its investment banker and also retained attorneys to work alongside the Company's in-house General Counsel. When I first came to the Company, Linda Ginsberg was General Counsel. When she left, Russell Nuce took over her position. During this time, Arthur was never legal counsel to the Company or the Board.

10. I was aware that Southbridge was being compensated for the work done on certain acquisitions. Southbridge was paid on the basis of the Lehman Formula, which is commonly used in many industries to compensate investment bankers who represent companies in merger and acquisition transactions according to a prescribed fee scale. At no time was it a secret that Southbridge was being compensated for its financial services.

ROGER GILMARTIN

Affirmed before me this 19th day of July, 2010

_____
Notary Public

CASSIE BROWN
Notary Public, Connecticut
My Commission Exp. 07/31/2014