UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

DAVID GILMORE, a shareholder of Covington
Fabrics Corp. a/k/a Covington Industries, Inc., and its
successor, Cele Holdings, Inc., two New York
corporations, and a limited member of CIRS, LLC, a
limited liability company organized under the laws of
South Carolina, and a limited member of Gilmore
Holdings, LLC, a New York limited liability
company, suing individually and in the right of Cele
Holdings, Inc. CIRS, LLC, and Gilmore Holdings,
LLC,

:   Case No. 09-CV-6230-WHP

                          Plaintiff,

  - against -

ABBY GILMORE, ARTHUR FREIERMAN and
SOUTHBRIDGE FINANCIAL CORP.,

                        Defendants.

------------------------------------------------------------------ X

## AFFIDAVIT OF ABBY GILMORE

STATE OF NEW YORK    )
                                  ) ss.
COUNTY OF NEW YORK  )

      Abby Gilmore, being duly sworn, hereby deposes and says:

      1.     I was President of Covington Fabrics Corp. a/k/a Covington Industries Inc. ("Covington" or the "Company") from 1986 until the Company was sold in 2006. I ran the business together with my father from 1981 until he took ill in 1991 and died in February 1992. I am named as a Defendant in the above-captioned action brought by my brother David Gilmore ("Denny"). I submit this affidavit in opposition to Plaintiff's Motion for Leave to File a Second

NYC:215316.2

Amended Complaint (the "Motion"). The Motion and the Declaration submitted by Denny in support of the Motion are full of untruths and hyperbole on numerous points, which I address below.

**Educational Background and Professional Roles**

2.  The Motion attempts to cast Denny and my other siblings, who are not parties to this action, as unsophisticated people by claiming that my husband, Arthur Freierman ("Arthur") and I have "superior learning." While it is true that my husband and I graduated from law school, my brother Denny has a B.A. from Columbia University, a PhD from the University of Pennsylvania, and has authored numerous books and anthologies on academic subjects, which have been cited by many scholars. He is currently a professor at SUNY Stony Brook and previously served as Chairman of his department. My sister Karen Gilmore ("Karen") has a B.A. from Harvard-Radcliffe and an M.D. from New York University. She is a psychiatrist in private practice and an Associate Professor at Columbia College of Physicians and Surgeons as well as Associate Director of the Columbia Center for Psychoanalytic Training and Research, head of the Child Division. My brother Michael Gilmore ("Michael") has a B.A. from Harvard University and a PhD from Yale University. He is a Professor of American Civilization at Brandeis University and the head of his department. He also has numerous books published by various university presses. It is fair to say that all three of my siblings have the wherewithal to make reasonable decisions or to ask the right questions to help them do so.

3.  After graduating from law school in 1980, I practiced law for one year until my father, Benjamin Gilmore, who founded the Company asked me to join him in

managing the family business in 1981. None of my siblings were interested in running the family business. In 1986, my father made me President of the Company.

4. Arthur practiced law from 1980-1984 as a corporate finance attorney at a New York law firm. He became General Counsel at a computer leasing company from 1984-1987. In 1987, Arthur ceased practicing law and moved to the business side, first as Senior Vice President and then as President of COS Computer Systems until it was sold in 1994. Arthur then founded Southbridge Financial Corp. ("Southbridge"), an investment advising and corporate finance boutique.

5. Contrary to Denny's claim, Arthur was not counsel to Covington, the Board or any individual members of the Board. From the early 1950's until 1995, the Company's legal advice was provided by an outside firm, Wolf, Popper, Ross, Wolf & Jones. Beginning in March 1995 and continuing through June 2004, the Company had a full-time General Counsel who attended quarterly Board meetings to address legal matters. *See* 1994 Board Meeting Minutes discussing the search for in-house counsel at p. 4, attached hereto as Exhibit A.[1] All Company directors had full access to such person. My siblings had their own attorneys in dealing with matters that affected them as shareholders of the Company. *See* October 6, 1994 Memo concerning negotiation of employment agreement, attached hereto as Exhibit B. Thus, Denny's claim that he relied upon Arthur and me for legal advice is totally fallacious.

6. With the exception of occasionally signing some routine collection letters for Covington between July 2004 and the time the Company was sold in 2006, Arthur has not

---

[1] All of the Company documents hereto are true and correct copies of Covington documents.

acted as an attorney since 1987. In connection with providing financial advice to the Company, Southbridge did have discussions with Covington's in-house and outside counsel, but Southbridge's invoices, which may reflect these conversations in minor references to "legal issues," do not show that Southbridge ever acted as the Company's attorney. My sister Karen acknowledged at her deposition that she never thought that Arthur or Southbridge was acting as the Company's attorney. *See* Karen Gilmore Deposition Transcript ("K. Gilmore Tr.") at 195-198, attached hereto as Exhibit C.

**Compensation and Fee Issues**

7.     After almost a year of negotiations, I entered into an employment agreement with the Company in January 1995. (A copy of my employment agreement is attached as Exhibit 2 to the Proposed Verified Second Amended Complaint (the "PSAC")). My agreed base salary of $350,000 was not a great increase from what my father was paying me before he died almost three years earlier. Section 8 of my employment agreement memorialized my right as President of the Company to hire consultants and employees without Board approval so long as that person was not receiving compensation per year greater than I received, as adjusted for cost of living increases. I hired many consultants and advisors over the years without discussing the details of their compensation with the Board. Southbridge never received the full amount permitted under my employment agreement.

8.     Contrary to Denny's assertion that my husband and I used the Company as our personal "piggy bank," I never took the full salary or bonus to which I was entitled under my employment agreement, even in years when the Company earned large profits. Denny's claim that under my father's leadership, Covington grew to a company with "gross profits well over

$100,000,000 per year" is false. In fact, Covington had <u>revenues,</u> not gross profits, of $45,497,000 in 1986, the year that I became President. Under my leadership, the Company grew to over $100,000,000 in revenues in 1993. See October 17, 1994 Memo at p. 1 attached hereto as Exhibit D. From 1992 until the sale of the Company, Denny, a 25% shareholder, personally received $3,250,000 in <u>after-tax</u> distributions, $195,000 in Board fees, plus nearly $1,000,000 in salary for his responsibility of signing checks on a one-day per week basis.

**<u>Covington's Asset Acquisitions</u>**

9. In the mid 1990's, the textile industry began to change. Many companies—and almost all the converters like Covington—went out of business or consolidated, due, in large part, to offshore manufacturing. To maintain market share, the Company needed to consider strategic acquisitions. My siblings were on board with this effort. In fact, Denny raised at a Board Meeting the Company's "need for innovation and expansion at [the] time when the textile industry [was] in flux." *See* June 1996 Board Meeting Minutes at p. 6, attached hereto as Exhibit E. Pursuing strategic alignments was also one of the reasons we hired Roger Gilmartin, with his attendant international expertise, in 1996. The first such acquisition of a relatively small distributor of fabrics in the U.K., "Chelsea of London," was accomplished with the help of Hy Shwiel, Covington's lead outside accountant at Ernst & Young, who had worked closely with my father for many years and was well known to Denny and the other Board members. Mr. Shwiel appeared at many Board meetings to discuss and explain Company finances.

10. Southbridge did not act as the Company's financial advisor in the Chelsea acquisition referenced in the PSAC (although Southbridge did handle the sale of Chelsea a few years later). Neither I nor the other members of the Board were happy with the results of this

first acquisition. We all believed that if the Company was going to pursue corporate acquisitions, we needed to engage someone with substantial transactional experience. Accordingly, when the opportunity arose to purchase the assets of Spectrum Fabrics in June 1994, I asked Southbridge to assist the Company in evaluating this acquisition.

11. Since the 1980's it has been customary, as confirmed by Roger Gilmartin in his affidavit, for companies such as Southbridge to be paid according to the "Lehman Formula," which is set forth in a memo to myself and copied to Mr. Shwiel dated December 28, 1994. A copy of this memo is attached as Exhibit 4 to the PSAC. Mr. Shwiel was given a copy of this memo because, as a partner in a large accounting firm, he could provide expertise in executive and consultant compensation arrangements. He was also well aware of business issues and Covington's financial situation and was involved in the first acquisition. Whenever an acquisition was contemplated, it was fully discussed at Board Meetings. With respect to Southbridge, the Board expressly authorized its services in connection with these transactions. *See* Board Meeting Minutes from June 7, 1996 at p. 6; September 20, 1996 at p. 5; November 30, 1996 at p. 6; April 3, 1998 at p. 8; June 5, 1998 at p. 3; September 11, 1998 at p. 4; attached hereto as Exhibit F. My sister Karen stated such at her deposition. *See* K. Gilmore Tr., attached hereto as Exhibit G, at 123-124. Furthermore, my brother Michael at his deposition admitted that he assumed Southbridge was getting paid for the work it was doing. *See* Michael Gilmore Deposition Transcript ("M. Gilmore Tr."), attached hereto as Exhibit H, at 176-177.

12. The Spectrum acquisition was a huge success for the Company, paying for itself in less than one year. See Memo dated October 17, 1994 re: "Growth Strategy for Covington" attached hereto as Exhibit D as previously referenced. Throughout the remainder of

6

the 1990's Covington continued to consider acquisition targets. With Southbridge's help, the Company examined and evaluated many potential targets. Southbridge would report to me and the Board as to the advisability of such acquisitions. Contrary to Denny's accusations that acquisitions were merely a means of paying Southbridge additional fees, there were many instances where Southbridge advised against pursuing a possible target. *See* September 20, 1996 Presentation to the Board attached hereto as Exhibit I. Other than the Chelsea acquisition, with which Southbridge was not involved, the acquisitions were generally successful. Each acquisition had a strategic purpose and was recommended to the Board for purchase only after thorough review, not only by Southbridge and me but by Roger Gilmartin, our CFO and other members of the management team.

13. Hindsight is easy for absentee owners like my siblings. I was in the thick of trying to strengthen a company that employed hundreds of people, many of whom worked for the Gilmore family for most of their working lives. With Southbridge's help in making these acquisitions and in other areas, I was able to successfully sell Covington in 2006 for over $10 million, pay each employee a bonus upon the sale, pay off or protect the Company's creditors and suppliers, pay off all the debenture holders (including many friends or family other than the Gilmore siblings), and continue the Company name.

14. It made sense for the Company to engage Southbridge to assist with acquisitions because Covington would otherwise have had to hire a financial advisory firm less familiar with the Company to perform the services Southbridge rendered, which included financial due diligence, reviewing documents, structuring and negotiating the transactions. *See* Southbridge invoices to Covington, attached to PSAC as Exhibits 5A-5D. In addition to the fact

that Denny saw Southbridge invoices while signing Company checks, the fact that Southbridge was compensated for its work on the acquisitions was also reflected in the Company's 1999/2000 audited financial statements, which disclosed that "Related Parties" had been paid $300,000 and $298,000, respectively, for those years. A copy of the Combined Financial Statements is attached hereto as Exhibit J. I believe that this "Related Parties" note was not included in the Company's financial statements before 1999 because the amounts were *de minimus*. Denny, as a member of the Board, received copies of these financial statements. *See* 2003 email from Denny stating that he received financial statements, attached hereto as Exhibit K.

**Denny's Involvement in Financial Matters and Check Signing**

15. Denny's claims that he has no understanding of fiscal or legal matters are simply not true. He served as chairman of his department at SUNY Stony Brook with all the personnel and financial issues attendant thereto, is a Founding Member and Treasurer for the Society for the Anthropology of Europe, and went through a protracted divorce proceeding with his first wife involving extensive financial and valuation issues. He has retained sophisticated counsel and accountants throughout the years.

16. The Company Board Minutes, prepared by Denny, reflect his participation in discussions of complicated business and financial matters. *See* January 2, 1983 Board Meeting Minutes at p. 3 ("David Gilmore raised the issue of the possibility of gifting common stock of the corporation to lineal descendants…"); May 24, 1983 Board Meeting Minutes at p. 3 ("After an extended period for questions and answers concerning the various legal and tax aspects of the Trust arrangements, David Gilmore asked about the establishment of declared value for the common stock and the various legal details involved"); March 5, 1986 Board

NYC:215316.2

Meeting Minutes at p. 2 ("David Gilmore inquired as to the proportion of savings due to lowered interest rates versus improved sales and reduced inventory"); September 19, 1997 Board Meeting Minutes at p. 3 (noting that, after a "question from David Gilmore concerning bookkeeping methods, there was some discussion of the current proportional allocation of expenses among the four divisions..."); Memorandum from Denny, dated June 9, 1997, to the Company's CFO questioning in great detail the amounts of certain distributions. These Board Meeting Minutes and Memo are attached hereto as Exhibit L.

17. Denny also had primary check signing authority for the Company. Denny would come into Covington's offices one day a week to sign checks. Our Accounting Department would gather the checks for Denny in one or two large "out-boxes." Denny reviewed the checks, together with back up, and often asked questions regarding payments. The checks Denny signed included those made payable to Southbridge. A copy of some of the many checks to Southbridge signed by Denny are attached hereto as Exhibit M. At one point in these proceedings, Denny suggested that he never signed large checks. Attached hereto as Exhibit N are certain checks to other vendors for significant amounts.

18. In order to meet Denny's new proposed claims, I have attempted to find all the checks Denny signed to Southbridge, but they seem to be missing from the Company boxes currently being held by the Receiver. Pursuant to a Stipulation agreed to when we consented to Plaintiff's appointment as Receiver, each side was required to give the other two days' notice before accessing any of the materials at the warehouse. While Arthur and I have been complying with this Stipulation and have been monitored by someone from Plaintiff's counsel's firm every time we visited the warehouse or Plaintiff's counsel's office, Plaintiff and

his counsel visited the warehouse on more than one occasion without notifying us, have unfettered access to Company files at their offices, and, based on my visits to Plaintiff's counsel's office to review documents in the boxes removed from the warehouse, it appears that they have rearranged their contents. Unfortunately, when I contacted Chase, the Company's bank to inquire about copies of Company checks, it told me that it does not keep copies of checks for more than seven years.

19. Denny makes much of a 2005 Memorandum sent from Lorraine Schultz, Covington's Executive Secretary, to department heads in anticipation of the Company's move to smaller offices. (A copy of this Memorandum is attached as Exhibit 4 to his Declaration.) Needless to say, this housekeeping memo is not something that would have been sent to the Board. For Denny to claim that this ordinary course memo was an attempt by myself or Southbridge to destroy documents is nonsensical, especially since the memo was written in 2005, four years before there was any litigation. Similarly, Denny's claim, based upon a 2009 email from my prior counsel Robert Meister, that Mr. Meister sought to destroy documents, is preposterous. Mr. Meister emailed Denny's counsel to discuss discarding boxes from prior to an agreed upon date in order to reduce shipping and storage costs. A copy of this email is attached hereto as Exhibit O.

**Denny's Access to Information Regarding Southbridge's Fees**

20. In 2007, after the Company was sold, Denny began demanding detailed information from Arthur questioning Southbridge fees. He also asked to see books and records for Cele Holdings, Inc. ("Cele"), the Company's successor as of 2006, which were being held in Southbridge offices that were shared with Denny's current wife. Arthur never denied Denny

NYC:215316.2

access to these materials. Further, if Denny wanted to see any books and records for Covington, they were still available to him in the Company warehouse. Arthur also prepared for Denny various explanations of Southbridge's fees, including a copy of the December 1994 Memo copied to Hy Shwiel. *See* August 23, 2007 email transmitting this information, plus attachments, attached hereto as Exhibit P. Denny retained counsel to examine these fees. As confirmed by Michael in his deposition, Denny's long-time attorney who had knowledge of the Company and had even attended Board Meetings in the past, reviewed the material provided by Arthur regarding the Southbridge fees and determined that they were reasonable. *See* M. Gilmore Tr. at 137, attached hereto as Exhibit Q. However, rather than work with me and Arthur to answer any questions that he had, Denny began to attack us. We stopped preparing memos and explanations for him because we no longer wished to receive personal insults and accusations in return.

21.   I fully understand that Denny is upset that the business our father built is no longer owned by the Gilmore family, although a much smaller version still exists. Indeed, no one misses the Company more than I. I worked day and night at that Company and sacrificed salary, bonuses and time with my family to continue the name we were all proud of. I took actions that I and my many advisors thought were right for the Company. With my 25% ownership, it should be obvious that I was not making decisions that I thought were deleterious. As was not the case for my other siblings who had other careers, Covington was my sole livelihood. It is disappointing that Denny feels the need to lash out at me and my husband through this lawsuit and blame me for events (such as the global transformation of the textile industry) over which I had no control.

NYC:215316.2

ABBY GILMORE

Affirmed before me this 21st day of July, 2010

_____
Notary Public

CASSANDRA PORSCH
Notary Public, State of New York
No. 02PO6146284
Qualified in New York County
Commission Expires May 15, 2014