```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED: 9/1/11               │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DAVID GILMORE,                          :

               Plaintiff,              :     09 Civ. 6230 (WHP)

  -against-                             :     MEMORANDUM & ORDER

ABBY GILMORE, et al.,                   :

             Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        This family business dispute concerns claims by Plaintiff David Gilmore

("David") against his sister, Abby Gilmore ("Abby"), her husband, Arthur Freierman, and their

closely-held financial services company, Southbridge Financial Corp. ("Southbridge").  David

alleges common-law fraud, breach of fiduciary duty, breach of contract, and violations of the

Racketeering Influenced and Corrupt Organizations Act ("RICO").  Defendants move for

summary judgment dismissing Plaintiff's RICO claims.  For the following reasons, Defendants'

motion is granted.  In addition, this Court declines to exercise supplemental jurisdiction over

Plaintiff's remaining state claims which are dismissed without prejudice.

## BACKGROUND

        This Court presumes familiarity with the underlying facts and procedural history

of this action.  See Gilmore v. Gilmore, No. 09 Civ. 6230 (WHP), 2010 WL 4910211, at *1-2

(S.D.N.Y. Nov. 15, 2010).

I.  Factual Background

        This case arises out of the management and disposition of Covington Industries

Inc. ("Covington"), a successful New York textile corporation founded by David and Abby's

father, Benjamin Gilmore. (Defendants Rule 56.1 Statement ("Def. 56.1") ¶ 1.) Following

Benjamin Gilmore's death in 1992, David, Abby and their two siblings, Karen Gilmore

("Karen") and Michael Gilmore ("Michael"), inherited equal shares of stock and a 25%

ownership interest in Covington. (Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl.

56.1(b)") ¶ 5.) As this litigation demonstrates, David and Abby now threaten to consume the

fruits of their father's industry.

Between 1992 and 2006, Abby served either as Covington's president or chief

executive officer. (Def. 56.1 ¶¶ 3, 17; Pl. 56.1(b) ¶ 3.) During that period, Arthur Freierman

provided Covington with various financial and investment services through his company

Southbridge. (Def. 56.1 ¶ 7.)

CIRS, LLC ("CIRS") was formed by the four Gilmore siblings to manage a

warehouse located in Spartanburg, South Carolina. (D. Gilmore Opp. Decl. Ex. 5: Operating

Agreement of CIRS, LLC (the "CIRS Op. Agreement") Art. II(8).) Each member of CIRS made

an equal capital contribution totaling $50,000. (CIRS Op. Agreement Art. IV(1) & Sch. A.)

Abby Gilmore acted as sole manager and handled the day-to-day business operations. (CIRS

Op. Agreement Art. V(1); 2d Amend. Compl. ¶ 38, Ex. 3.) Freierman provided additional

management services to CIRS. (Pl. 56.1(b) ¶ 38.) Members also had certain additional rights,

including the rights to: (1) elect and remove managers upon unanimous vote; (2) inspect

company books and records; (3) call a special meeting; (4) make additional capital contributions;

(5) first refusal on any proposed offers by other members to sell their interests to non-family

members; and (6) vote on whether to sell or otherwise dispose of the warehouse. (CIRS Op.

Agreement Arts. III(1), IV(5)-(6), V(1)-(2), VI(2)(i), IX(5).)

2

A third company, Gilmore Holdings, LLC ("Gilmore Holdings"), was formed in 2002 when HSBC, Covington's factor, demanded additional collateral of $1 million, and each Gilmore sibling posted $250,000. (D. Gilmore Opp. Decl. ¶ 12.) Abby agreed to a personal guaranty to secure Covington's performance under the HSBC factoring line, on the condition that her siblings granted her indemnification. (D. Gilmore Opp. Decl. ¶ 12.) Accordingly, Gilmore Holdings used the funds to purchase a certificate of deposit in the face amount of $1,000,000 and entered into an indemnification agreement with Abby. (D. Gilmore Opp. Decl. ¶ 12 & Exs. 1-3.) The relevant provisions of the Gilmore Holdings Operating Agreement provide all members with: (1) equality; (2) approval for all actions; (3) management; (4) authority to amend the Operating Agreement or dissolve the company; (5) equal allocation of profits and losses; (6) authority to veto any transfers of membership interests outside of the family; and (7) authority to bind the company. (D. Gilmore Opp. Decl. Ex. 1, at §§ 6, 10, 12, 14, 16(a), 21.)

David's RICO claims are based on his allegations that Abby Gilmore and Freierman engaged in a multi-year scheme to defraud him and his siblings by looting the family companies through self-dealing, fraudulent securities transactions, and overbilling. Part of the alleged scheme involved six asset acquisitions between 1994 and 1999 in which Covington paid Freierman and Southbridge undisclosed finder's fees. (2d Amend. Compl. ¶¶ 39-40.) The "secret" finder's fee arrangement was memorialized in a "confidential" memorandum dated December 28, 1994 from Freierman to Abby but was not disclosed to the other Gilmore siblings. (2d Amend. Compl. Ex. 4: Memorandum from Freierman to Abby Gilmore dated Dec. 28, 1994 at 1.)

In another part of the scheme, Plaintiff alleges that in August 2005, Karen and her husband Mitchell Charap were duped into transferring their interests in the Gilmore companies—

namely, their Covington stock, CIRS and Gilmore Holdings membership interests, and debentures to Freierman—for the discounted sum of $260,000. (Pl. 56.1(b) ¶ 16; Def. 56.1 ¶ 16; D. Gilmore Decl. Ex. 6.) Specifically, Karen was motivated, in part, to divest her Covington stock by Abby's and Freierman's representations that Karen would be partially liable for a $2 million shortfall in connection with Covington's pension plan. (Pl. 56.1(b) ¶ 16; Itkowitz Opp. Decl. ¶ 16.) Further, because of Abby's and Freierman's misrepresentations, David approved Karen's divestiture to Freierman and was denied his right of first refusal. (Pl. 56.1 ¶ 13, 14.)

In January 2006, a Georgia limited liability company purchased Covington's assets and assumed its liabilities for $8,865,000 in cash and a subordinated promissory note for $1,182,798. (2d Amend. Compl. ¶ 86.) Covington was renamed Cele Holdings ("Cele"). (2d Amend. Compl. ¶ 85.) As part of the transaction, Cele paid off CIRS' mortgage with JP Morgan from the Covington sale proceeds and issued a new note to CIRS in the amount of $1,793,538. (2d Amend. Compl. ¶ 87.) David and Michael each received $438,740 for a 40% payment of their Covington debentures. (2d Amend. Compl. ¶ 88. ) David claims that Defendants fraudulently represented that the remaining debentures could only be paid off by refinancing the new CIRS note and obtaining personal guarantees. (2d Amend. Compl. ¶¶ 88, 89, 92; D. Gilmore Decl. ¶ 24.)

In December 2006, in response to Defendants' representations, Michael agreed to have Defendants take over his share of the CIRS note and his membership interest in CIRS in exchange for payment of his $500,000 outstanding debentures and $25,000 in equity. (D. Gilmore Decl. ¶ 24.) Michael's divesture of his CIRS membership interest involved a complicated inter-company loan transaction that required David to pay $124,392.70 and accept $166,666.67 for his outstanding $500,000 debentures. (D. Gilmore Decl. ¶ 24.)

II. Procedural Background

   This action was filed on July 13, 2009. (ECF No. 1.) At a pretrial conference on October, 20, 2009, this Court urged the parties to address the sufficiency of the RICO claim. Thereafter, in December 2009, Plaintiff filed a first amended complaint naming additional parties. (ECF No. 24.) Discovery ensued and multiple discovery extensions were granted. (ECF Nos. 39, 55, 82, 93, 96, 98, 101.)

   In May 2010, David sought leave to amend his complaint for a second time based on discovery conducted in the interim. (ECF No. 56.) The parties agreed that a motion to amend was appropriate. On November 15, 2010, that motion was granted and Plaintiff filed his amended complaint three days later. (ECF Nos. 74, 85.) On December 21, 2010, this Court again advised the parties (this time on the record) during a pre-motion conference for sanctions that the RICO claims should be addressed with a summary judgment motion to be filed by January 7, 2011. (Dec. 21, 2010 Hearing Tr. at 20-21.) Defendants did not heed that direction. On January 3, 2011, the parties informed the Court that they would not move for sanctions. (ECF Nos. 89.) Defendants did not seek summary judgment dismissing the RICO claims until July 11, 2011, after submission of the Joint Pretrial Order and after the final pretrial conference on June 16, 2011. (ECF Nos. 89, 124.) And this Court heard oral argument on the motion on August 19, 2011.

DISCUSSION

I. Legal Standard

   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

5

law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986);

Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The burden of demonstrating the absence of any

genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co.,

398 U.S. 144, 157 (1970). Once the moving party has made the initial showing that there is no

genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a

scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that

there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986) (emphasis in original); Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315

F.3d 171, 175 (2d Cir. 2003) (citation omitted). "Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for

trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586-87). The

Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party.

Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).


## II. RICO Claims

Defendants move to dismiss Plaintiffs' RICO claims because: (1) the claims are

barred by the Private Securities Litigation Reform Act ("PSLRA"), (2) the claims involve a

family dispute, (3) Plaintiff fails to allege a pattern of racketeering, and (4) Plaintiff fails to prove

an enterprise between the Defendants. This Court need only reach Defendants' first argument to

dismiss Plaintiff's RICO claims.

Under § 107 of the PSLRA, a civil RICO claim may not be premised on conduct

that would have been actionable under the securities laws as fraud in the purchase or sale of

securities. See MLSMK Investment Co. v. JP Morgan Chase & Co., --- F.3d ----, No. 10-3040-

cv, 2011 WL 2640579, at *13-14 (2d Cir. July 7, 2011); Thomas H. Lee Equity Fund V, L.P. v.

Mayer, Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009).  The "PSLRA

bars all RICO claims based on any conduct that could be actionable under the securities laws."

Cohain v. Klimley, No. 08 Civ. 5047 (PGG), 2010 WL 3701362, at *10 (S.D.N.Y. Sept. 28,

2010) (emphasis in original).  That rule holds even where plaintiff cannot itself pursue a

securities fraud action against the defendant.  MLSMK, 2011 WL 2640579, at *8; see also

Cohain, 2010 WL at *8 (citing Howard v. America Online, Inc., 208 F.3d 741, 749-50 (9th Cir.

2000) (holding that plaintiffs who lacked standing to bring securities fraud claims could not

assert RICO claims based on the securities fraud conduct, because the PSLRA amendment to the

RICO statute bars reliance on "any conduct" actionable as securities fraud)).

        For a typical securities fraud claim under § 10(b), a Plaintiff must show: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  Thomas H. Lee, 612

F. Supp. 2d at 274 (citing Stonebridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148,

157 (2008)).  Each of those elements could be met by Karen's and Michael's divesture of their

stock and other interests in the family corporations at steep discounts in response to Defendants'

alleged misrepresentations.  Because of those misrepresentations, David claims that he was

deprived of his right of first refusal and received a substantially discounted amount for his

Covington debentures.

        Plaintiff argues that Defendants waived their defense under the PLSRA because it

was never pled and only first disclosed in the Joint Pretrial Order.  However, waiver is not

automatic and "as a practical matter there are numerous exceptions."  Am. Fed. Grp. v.

7

Rothenberg, 136 F.3d 897, 910 (2d Cir. 1998).  In particular, where a plaintiff has notice and an opportunity to argue the merits of a defense, it is not waived by failing to plead it in the answer. Curry v. City of Syracuse, 316 F.3d 324 (2d Cir. 2003).  Plaintiff concedes that it had notice of all of the defenses listed in the Joint Pretrial Order at least as early as Defendants' expert disclosure on April 6, 2011.  (See Pl. Summ. J. Reply at 8.)  Although discovery was closed at that point, the parties had previously requested and been granted numerous discovery extensions beyond that date.  Had another extension been requested, Plaintiff would have had an opportunity to pursue discovery and explore the merits of the defense.  But no such request was made at the time the expert report was disclosed.

Plaintiff also argues that none of the predicate acts could have been brought under the securities law because the Covington stock and member interests in CIRS and Gilmore Holdings are not securities.  With regard to Covington stock, Plaintiff contends that it does not pass the five part "economic realities" test set forth in Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985), for determining whether a conveyed interest called "stock" is governed by the securities laws.  In Landreth, the Supreme Court held that the elements of a stock security are: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value."  Landreth, 471 U.S. at 686.  Plaintiff concludes that the Covington stock fails the Landreth test because the shareholder agreement placed limitations on the stock's negotiability and banned its ability to be pledged or hypothecated.  (D. Gilmore Decl. Ex. 2 at ¶ 8, ¶ 9(a).)

However, Plaintiff's argument ignores controlling authority in this Circuit that "[t]here is no need to resort to the economic realities test where, as here, the transaction

concerned stock in a for-profit corporation, 'the paradigm of a security.'" Sulkow v. Crosstown, 807 F.2d 33, 37 (2d Cir. 1986).  Such stock, like the Covington stock, is a security despite limitations on the stock's negotiability and pledge-ability.  Sulkow, 807 F.3d at 37; see also Overton v. Todman & Co., 478 F.3d 479, 488-89 (2d Cir. 2009) (citing Sulkow and holding that stock in a close corporation is a security).  Accordingly, there is no genuine dispute that Covington stock is a security under the securities laws.

The membership interests in CIRS and Gilmore Holdings, unlike stock, are examined on a case by case basis, and are deemed to be securities if they represent (1) an investment in a common venture, (2) premised on a reasonable expectation of profits, and (3) derived from the entrepreneurial or managerial efforts of others.  See S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946); see also Nelson v. Stahl, 173 F. Supp. 2d 153, 164 (S.D.N.Y. 2001) ("An LLC membership interest can be considered a security when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control.") (internal quotation omitted).

Karen's and Michael's LLC member interests in CIRS are securities.  CIRS was formed as a common venture among the siblings to profit from the building and premises located in Spartanburg, South Carolina.  The members had a reasonable expectation they would profit from the management of the property.  Last, while the members retained some rights under the LLC agreement, the members were dependent upon Abby's efforts to run and control the company.   Under the agreement, Abby was delegated as sole manager and handled all of the managerial duties with her husband Freierman.

In cases where members retain a substantial amount of management rights, member interests are not considered securities.  See Nelson, 173 F. Supp. 2d at 166 (member

9

interest were not securities where the members had sole control over management decisions);
accord Keith v. Black Diamond Advisors, Inc., 48 F. Supp. 2d 326, 333-34 (S.D.N.Y. 1999).
Thus, the member interests in Gilmore Holdings are not securities.  There is no dispute that each
member in that LLC had an equal managerial responsibility, and therefore any expectation of
profits would not be by the efforts of others.  Nevertheless, the Covington stock and member
interest in CIRS are securities and therefore some of the conduct underlying David's RICO
claims could have been brought under the securities laws.

Last, Plaintiff attempts to separate Karen's and Michael's transfer of Covington
stock and member interests in CIRS from the asset acquisitions from 1994-1999 and other
allegations of fraud that did not involve securities transactions.  David argues that the latter
predicate acts, which did not involve securities transactions, could independently support a RICO
claim.  However, "[h]aving alleged . . . that defendants acts were part of a single fraudulent
scheme the [plaintiff] cannot divide the scheme into its various component parts.  Allowing such
surgical presentation here would undermine the Congressional purpose behind the . . .
amendment to RICO."  Seippel v. Jenkens & Gilchrest, P.C., 341 F. Supp. 2d 363, 373
(S.D.N.Y. 2004).  Plaintiff's over-arching theory of this case is that Abby Gilmore and
Freierman engaged in various plots to loot Covington and the other family corporations.  That
conduct counts as a single scheme, and the securities aspects of the fraud must be aggregated
with the non-securities aspects.  See Ling v. Deutsche Bank, AG, No. 04 Civ. 4566 (HB), 2005
WL 1244689, at *3 (S.D.N.Y. 2005) ("Essentially, the Court must . . . not parse out various
steps.  If one predicate act alleges breaches of duty coincident with securities transactions, the
whole scheme is subject to the PSLRA bar.");  see also Gatz v. Ponsoldt, 297 F. Supp. 2d 719,
(D. Del. 2003) (dismissing RICO claim predicated on allegations that the defendant looted a

corporation in a multipart scheme involving securities and non-securities transactions spanning nine years).

Plaintiff's reliance on <u>Ring v. AXA Financial, Inc.</u>, 483 F.3d 95 (2d Cir. 2007) for the disaggregation of its fraud claims is misplaced. <u>Ring</u> did not involve RICO claims, and there the Court permitted the securities fraud claims to be separated because it found that the unique insurance product in question involved separate allegations of fraud and implicated a separate regulatory insurance structure. None of those issues are present in this case and therefore, <u>Ring</u> is inapposite. Accordingly, there is no genuine dispute that components of Plaintiffs alleged action could have been brought under the securities laws and Plaintiff's RICO causes of action are dismissed.

III. <u>Subject Matter Jurisdiction</u>

Because subject matter jurisdiction was based solely on 28 U.S.C. § 1331 and on the federal questions presented by Plaintiff's RICO claims, which are now dismissed, this Court may decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. 28 U.S.C. § 1367(c). The decision to exercise jurisdiction is entirely within the court's discretion and is not a litigant's right. <u>See</u> <u>Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.</u>, 464 F.3d 255, 263 (2d Cir. 2006).

In deciding whether to exercise jurisdiction over supplemental state law claims, district courts should balance the so-called "Cohill-factors," i.e., the values of judicial economy, convenience, fairness, and comity. <u>Klein</u>, 464 F.3d at 262 (citing <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988)). It is well settled that where the federal claims are dismissed in the early stages of litigation, courts should generally decline to exercise jurisdiction over

11

remaining state claims. Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006). On the other hand, a court should generally retain jurisdiction if the state claims implicate preemption issues, the federal claims are voluntarily dismissed days before trial, or the court has decided multiple prior dispositive motions. Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003). While this case is clearly not in its early stages, this is the first dispositive motion the parties presented to the Court and the pleadings remain in a state of flux. None of the concerns listed in Valencia ex rel. are present here, and therefore this Court is not compelled to retain jurisdiction.

The Cohill factors favor dismissal. Plaintiffs and Defendants reside in New York and can conveniently litigate this case in state court. While some duplication of efforts is unavoidable if this action is dismissed and restarted, discovery is complete and there is no reason why the case could not be quickly readied for a trial in state court. Moreover, the parties cannot complain of delay caused by dismissal at this stage. While the parties have brought multiple pretrial disputes to this Court in litigation verging on the vexacious, this is the first dispositive motion. Moreover, this Court advised the parties early in the case, and again in December 2010, that the RICO claims should be dealt with by dispositive motion. In addition, because this case involves purely state law questions, and does not raise any issues of preemption, comity favors having a state court preside over the trial. Finally, this Court notes one Defendant's recent health concerns and the scheduling problems that will pose for trial. That, at least, favors a sober reassessment of whether a trial could reasonably go forward at this juncture.

In sum and in view of the Cohill factors, this Court declines to exercise supplemental jurisdiction. The parties could have raised this dispositive issue much earlier and saved themselves and the Court considerable time. Discovery is complete and the case is ready

for trial, subject only to a flurry of motions in limine, which can be resolved in due course by the state trial judge.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment dismissing Plaintiff's RICO claims is granted. This Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are dismissed without prejudice. The Clerk of the Court is directed to terminate all pending motions and mark this case as closed.

Dated: September 1, 2011
     New York, New York

                               SO ORDERED:

                               WILLIAM H. PAULEY III
                                     U.S.D.J.

*Counsel of Record:*

Jay B. Itkowitz, Esq.
Itkowitz & Harwood
305 Broadway, 7th Floor
New York , NY 10007
*Counsel for Plaintiff*

Mathew E. Hoffman, Esq.
Barton Barton & Plotkin
420 Lexington Avenue
New York, NY 10170
*Counsel for Defendants*